IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VINCENT PAUL YOUNG, JR., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-08-CV-3649 |
| | § | |
| RODNEY D. VANNERSON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is a trademark dispute over rights to the marks "VY" and "INVINCEABLE." The plaintiffs, Vincent Paul Young, Jr. and Vince Young, Inc., sued Rodney D. Vannerson, Enos Cabell, Tom Roberson, and the joint venture of "Three Friends," alleging trademark infringement and related causes of action under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Texas state law. (Docket Entry No. 1). Young, a professional football player, asserts that he is widely known by his initials – "VY" – and nickname – "Invinceable." Vannerson filed intent-to-use trademark applications with the United States Patent and Trademark Office to use the marks VY and INVINCEABLE for a variety of commercial products. Vannerson formed a joint venture, Three Friends, with Cabell and Roberson, to share ownership of the potential rights, expenses, and proceeds associated with these marks. In this suit, the plaintiffs assert that the defendants have engaged in substantial preparations to sell products using these marks. Young asserts that he is a senior user of the marks and has a common-law ownership interest in the trademark rights. The plaintiffs seek a permanent injunction and

a declaration that they have the exclusive right to use the marks VY and INVINCEABLE, that their use of these marks does not infringe any possible rights of the defendants, and that the defendants have no rights in these marks.[1]

The defendants have moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted. (Docket Entry No. 12). The plaintiffs responded, (Docket Entry No. 14), and filed a supplemental response, (Docket Entry No. 23).

Based on a careful review of the pleadings, the motion and responses, and the applicable law, this court denies the defendants' motions to dismiss. The reasons are explained in detail below.

---

[1] The plaintiffs have also moved for leave to file an amended complaint to include causes of action for false sponsorship under the Lanham Act, appropriation of name and likeness under Texas common law, and common law fraud. (Docket Entry No. 11). The plaintiffs assert that the facts giving rise to these allegations and causes of action were uncovered "[d]uring the course of recent discovery." (*Id*). The defendants have not responded to the motion for leave. The plaintiffs filed an amended complaint on February 20, 2009. (Docket Entry No. 16).

Rule 15(a) states that "[t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a). This language "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002)) (internal quotations omitted). Although a court "should freely give leave when justice so requires" under Rule 15(a), leave to amend "is not automatic." *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F.Supp.2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)). The decision "lies within the sound discretion of the district court." *Little v. Liquid Air Corp.*, 952 F.2d 841, 845-46 (5th Cir. 1992). A district court reviewing a motion to amend pleadings under Rule 15(a) may consider factors such as "whether there has been 'undue delay, bad faith or dilatory motive . . ., undue prejudice to the opposing party, and futility of amendment.'" *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996)).

The plaintiffs filed this lawsuit on December 12, 2008. Limited discovery has been conducted. No scheduling order has been entered. The plaintiffs moved for leave to amend on January 30, 2009. The defendants will not be unfairly prejudiced if leave to amend is granted. The plaintiffs' motion for leave to file an amended complaint is granted.

## I.     Background

The facts are set out in the amended complaint.  Young is a professional football

player for the National Football League's ("NFL") Tennessee Titans.  (Docket Entry No. 16,

at ¶ 11).  He played high school football in Houston, Texas and was named National Player

of the Year by Student Sports Magazine in 2001.  (*Id.*, at ¶ 19).  Young  played college

football at the University of Texas ("UT") from 2002 to 2006.  As a collegiate athlete, Young

licensed his name and likeness to UT "to promote their entertainment services and football

program."  (*Id.*, at ¶ 13).  Young asserts that he became widely known as "VY" and

"INVINCEABLE" during his "highly publicized collegiate football career."  (*Id.*, at ¶¶

17–20).  He asserts that UT protected his name and likeness by sending cease-and-desist

letters to entities using the names "VY" and "INVINCEABLE."  (*Id.*, at ¶ 15).  In 2005, his

final season at UT, Young received several national awards, including college player of the

year and the Davey O'Brien Quarterback Award, and was named a Heisman Trophy finalist

and runner-up.  (*Id.*, at ¶ 21).  On January 4, 2006, Young led UT to a BCS National

Championship with a victory in the Rose Bowl.  (*Id.*, at ¶ 23).  Young scored the winning

touchdown, was named the Rose Bowl's Most Valuable Player, and was featured on the

cover of a commemorative issue of *Sports Illustrated*.  (*Id.*).  After being selected by the

Titans as the third overall pick in the 2006 NFL draft, Young was named the NFL's

Offensive Rookie of the Year.  (*Id.*, at ¶ 24).  The plaintiffs assert that Young "has become

one of the most recognizable figures in professional football."  (*Id.*).  He is featured on the

cover of "Madden 2008," a video game produced by EA Sports.  (*Id.*).  Young "currently has

endorsement contracts wherein he has licensed his name and likeness," including his "proprietary rights to his nicknames and his abbreviated name," to various entities, including Vincent Young, Inc.  (*Id.*, at ¶ 16).

On January 5, 2006, one day after the Rose Bowl, Vannerson filed four intent-to-use trademark applications relating to the marks "VY" and "INVINCEABLE."  (*Id.*, at ¶ 25). In application 78/786,063, Vannerson stated his intent to use VY for "computer games, electronic games, video games" in International Class 009 and for "clothing" in International Class 025.  (*Id.*, at ¶ 27).  Application 78/786,883 stated that Vannerson intended to use VY for "posters, photographs, pictures, and decals" in International Class 016 and for "candy" in International Class 030.  (*Id.*, at ¶ 29).  Application 78/786,069 was to use INVINCEABLE for "computer games, electronic games, video games, computer program games, computer game software, electronic game programs, electronic game software, [and] video game software" in International Class 009. (*Id.*, at ¶ 26).  And Application 78/786,882 stated that Vannerson intended to use INVINCEABLE for "computer games, electronic games, [and] video games" in International Class 009 and for "clothing" in International Class 025.  (*Id.*, at ¶ 28).  The applications all stated that the applicant entity type was "individual." (*Id.*, at ¶ 42).

On the same day that Vannerson filed the trademark applications, he formed "Three Friends" with defendants Enos Cabell and Tom Roberson.  (*Id.*, at ¶ 39).  Vannerson, Cabell, and Roberson are all residents of the greater Houston metropolitan area.  (*Id.*, at ¶¶ 3–5). Their agreement stated that "the Three Friends consider this agreement a joint venture even

though all filings with the U.S. Patent and Trademark Office were made and will remain in the name of Rodney Vannerson, as an individual." (*Id.*, at ¶ 39).  Under the agreement, "[a]ll expenses associated with the trademark protection and market awareness of the mark along with all proceeds generated from the use and/or sale of the mark will be shared between the Three Friends and their Attorney based on the following rights of ownership; Enos Cabell – 25% Ownership, Tom Roberson – 25% Ownership, Rodney Vannerson, 50% Ownership." (*Id.*).  Vannerson acknowledged that he did not own the marks at issue when he filed the trademark applications.  (*Id.*, at ¶ 40).

The plaintiffs assert that before Vannerson filed the trademark applications, Young was so widely known by the names "VY" and "Invinceable" that these names "unmistakeably [sic] point to" Vince Young.  (*Id.*, at ¶ 30).  The plaintiffs assert that the names VY and INVINCEABLE "have been used in commerce and/or in a manner analogous to use which created [Young's] proprietary rights." (*Id.*, at ¶ 31).  On July 24, 2006, Young applied for a trademark to use "VY" for clothing and sportswear.  On November 19, 2007, Vincent Young, Inc. applied for a trademark on a shield logo that incorporates the letters "VY" and the words "V. Young." (*Id.*, at ¶ 33).  The plaintiffs established a website to sell products using the "VY" shield logo and the "V. Young" mark, including computer games, video games, photographs, trading cards, clothing, footwear, toys, figurines, candy, and food.  (*Id.*, at ¶ 32).  Young has an endorsement contract with the footwear company Reebok, which, according to the plaintiffs, currently sells "products with a VY logo that is

confusingly similar to the marketing logo developed by defendants." (Docket Entry No. 14, at 5).

The plaintiffs allege that the defendants "have expended great physical and financial resources to develop, to market [,] and to brand plaintiff['s] VY image." (*Id.*, at ¶ 49). According to the plaintiffs, the defendants have "contacted several manufacturers" and "produce[d] samples of various products for use with the VY and Invinceable marks." (*Id.*, at ¶ 36). The plaintiffs allege that the defendants have produced T-shirts and decals using a VY logo similar to Vincent Young, Inc.'s VY shield. (*Id.*). Both logos have a "three pointed enclosed figure with the letters vy contained therein." (*Id.*, at ¶ 34). The plaintiffs allege that the defendants have "approached organizations to develop marketing strategies and are "testing the market" with several different types of products using the marks. (*Id.*, at ¶ 36). The plaintiffs assert that the defendants plan to license the marks to "individuals who can use [them]." (*Id.*). The plaintiffs point to Vannerson's deposition testimony that the defendants "created samples to directly license to plaintiff VY for use in commerce." (*Id.*).

In this suit, the plaintiffs allege that Vannerson filed the intent-to-use applications for the purpose of creating a false connection with Young and of interfering with the plaintiffs' proprietary rights to the VY and INVINCEABLE marks. The plaintiffs allege that Vannerson violated the Lanham Act by failing to obtain Young's consent before registering a trademark that "consists of a name, portrait, or signature identifying a particular living individual." The plaintiffs allege that Vannerson did not have a bona fide intent to use the

VY and INVINCEABLE marks in commerce when he filed the trademark applications, as required by the Lanham Act.  The plaintiffs allege that the defendants' conduct, including applying for trademarks on the VY and INVINCEABLE marks, has caused damage to, and interfered with, Young's product endorsements.

Young filed an opposition proceeding with the Trademark Trial and Appeal Board ("TTAB") of the Patent and Trademark Office on April 26, 2007.  Young is opposing Vannerson's intent-to-use trademark applications for the VY and INVINCEABLE marks. That proceeding is pending.  The plaintiffs filed this lawsuit on December 12, 2008 seeking relief that includes an injunction and declaratory judgment.  The motion to dismiss followed.

## II.     The Motion to Dismiss for Lack of Subject-Matter Jurisdiction

### A.      The Applicable Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists.  *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  "Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant County*, 798

F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997); *see also Clark*, 798 F.2d at 741.  When a party challenges the allegations supporting subject-matter jurisdiction, the court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to dismiss to a Rule 56 motion for summary judgment.  The court may consider matters outside the pleadings, such as testimony and affidavits, to resolve a factual challenge to subject-matter jurisdiction, without converting the motion to dismiss to one for summary judgment.  *See Garcia*, 104 F.3d at 1261.

### B.    Analysis

The defendants argue that this court lacks subject-matter jurisdiction to issue a declaratory judgment on the plaintiffs' trademark claims because there is no actual controversy.[2]  The defendants argue that this action is premature because they do not have

---

[2]     At the initial conference held on March 30, 2009, the defendants suggested that this court should defer to the pending TTAB proceeding.  The plaintiffs responded that this court has jurisdiction to consider the declaratory judgment claim notwithstanding the presence of the TTAB proceeding.

The doctrine of primary jurisdiction consists of "a set of precedents that guide courts in deciding when an issue should be resolved in the first instance by an agency that has special competence to address

any trademark rights to assert unless their applications "mature" into registrations and they have not used the marks in commerce. The defendants contend that "it is only use, not thinking about using them, that could conceivably be actionable." (Docket Entry No. 12, at 8). The defendants argue that they only have potential or prospective rights to the marks and have not used the marks, and, as a result, have not engaged in any activity that could create in the plaintiffs a reasonable apprehension of suit.

The plaintiffs point to Vannerson's testimony in connection with the TTAB proceeding. In his deposition, Vannerson was asked what he would do if he learned that someone was selling a product with the VY or INVINCEABLE mark. Vannerson responded, "I would think I would have a cause of action. I would think that I would have a right to try and prohibit them from doing that." (Docket Entry No. 14, at 6). The plaintiffs also point to a settlement offer made on December 10, 2008 in the TTAB proceeding. The defendants' attorney stated that if the offer was not accepted, he would "exercise every means available

---

it." *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 80 (1st Cir. 1996) (citing *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). It "does not speak to the jurisdictional power of the federal courts," but rather, "simply structures the proceedings as a matter of judicial discretion, so as to engender an orderly and sensible coordination of the work of agencies and courts." *United States v. Bessemer & L.E. R. Co.*, 717 F.2d 593, 599 (D.C. Cir. 1983) (quoting *Cheney State Coll. Facility v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983)). If applicable, the doctrine "requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper*, 507 U.S. 258, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993).

When, as here, a parallel administrative proceeding is pending, courts have consistently declined to defer to the TTAB when additional claims are raised that cannot be resolved by the agency. *See Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1162-63 (9th Cir. 2007); *PHC*, 75 F.3d at 80; *see also Robin Singh Educational Services Inc. v. Excel Test Prep Inc.*, 274 Fed.Appx. 399, 403 (5th Cir. 2008) (observing that "federal courts are not obligated to defer to PTO proceedings nor are PTO's findings on infringement binding on federal courts"). Here, the plaintiffs have asserted claims for fraud, unfair competition, and tortious interference with a business relationship. These claims are not at issue in the TTAB proceeding. Accordingly, this court will not decline to exercise jurisdiction under the primary jurisdiction doctrine.

to protect [his] client's interests."  (*Id.*, Ex. A).  The plaintiffs also point to the defendants'

preparations to use the marks, including producing samples of various products incorporating

the marks, contacting manufacturers, and "testing the market."  The plaintiffs assert that they

reasonably believe the defendants will sue them if they continue to use the VY and

INVINCEABLE marks in their own products and endorsements.

Alternatively, the plaintiffs argue that Vannerson's bad faith in applying for the

trademarks without a *bona fide* intent to use the marks creates an actual controversy.  The

plaintiffs allege that when Vannerson filed the intent-to-use trademark applications, he knew

of Young's rights in the VY and INVINCEABLE marks.   The plaintiffs allege that

Vannerson filed the applications and sold his interest in the trademark application to the

Three Friends joint venture for the purpose of obtaining trademark rights and licensing them

to others, including Young.  The plaintiffs argue that these actions have interfered with the

plaintiffs' ability to obtain new endorsement contracts using VY or INVINCEABLE on

products by creating fear that the defendants will sue for infringement.

The Declaratory Judgment Act provides, "In a case of actual controversy within its

jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading,

may declare the rights and other legal relations of any interested party seeking such

declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The

phrase 'case of actual controversy' "refers to the type of 'Cases' and 'Controversies' that are

justiciable under Article III."  *MedImmune*, *Inc. v. Genentech*, *Inc.*, 549 U.S. 118, 127, 127

S.Ct. 764, 166 L.Ed.2d 604 (2007).  The Supreme Court has not articulated a bright-line rule

for determining when a case satisfies the controversy requirement.  The Court has stated that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).  "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*

Declaratory judgment actions asserting intellectual property rights are usually brought by potential infringers seeking a declaration of noninfringement or invalidity.  *See*, *e. g.*, *Lang v. Pac. Marine & Supply Co.*, *Ltd.*, 895 F.2d 761, 763 (Fed. Cir. 1990).  Such actions may also be brought by intellectual property owners seeking declarations of impending infringement.  *See id.* (collecting cases).  If the controversy requirement is met, a plaintiff should be able to seek a declaratory judgment on infringement, particularly when the defendant could have maintained an action for noninfringement or invalidity.  *Id.* at 764.

The Federal Circuit previously applied a two-part test to determine whether the requisite case or controversy exists to support a declaratory judgment action asserting invalidity, noninfringement, or unenforceability of a patent: (1) whether the declaratory-judgment plaintiff had produced or was preparing to produce an allegedly infringing product; and (2) whether the conduct of the declaratory-judgment defendant gave rise to a reasonable

11

apprehension of suit on the part of the plaintiff.  *See Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 497 F.3d 1271, 1283 (Fed. Cir. 2007).  The Fifth Circuit adopted this standard and extended it to all types of intellectual property disputes, including trademark.  *See Texas v. W. Publ'g Co.*, 882 F.2d 171, 175 (5th Cir. 1989) (applying the two-part test in a copyright case, but viewing it as generally applicable to "intellectual property case[s]").  When the purported owner of an intellectual property right sought a declaratory judgment to protect that right from future infringement, a modified test applied.  Under the modified test, for a controversy to exist, "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a) (1982), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming."  *Lang*, 895 F.2d at 764.

A case or controversy exists in the trademark context "where a party has engaged in a course of conduct evidencing a 'definite intent and apparent ability to commence use' of the [allegedly infringing] marks on [a] product."  *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595–96 (2d Cir. 1996) (quotation omitted).  A defendant "need not have engaged in actual manufacture, use, or sale of a potentially infringing product" for a plaintiff to seek a declaratory judgment of infringement.  *See Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1215 (7th Cir. 1980).  Rather, the potential infringer must have at least undertaken "meaningful preparation for such activity."  *See Arrowhead Indus. Water, Inc. v. Ecolochem*,

*Inc.*, 846 F.2d 731, 736 (7th Cir. 1988); *see also Starter Corp.*, 84 F.3d at 596 (requiring that the party be "actively preparing to produce the article in question"); *DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.*, 62 F.3d 1397, 1401 (Fed. Cir. 1995) (requiring a showing of meaningful preparation for making, selling, or using an allegedly infringing product); *G. Heileman Brewing Co.*, *Inc. v. Anheuser Busch*, *Inc.*, 873 F.2d 985, 990–91 (7th Cir. 1989) (requiring that the plaintiff be "actively preparing to produce" an allegedly infringing product).  Because "[d]eclaratory judgment actions are particularly useful in resolving trademark disputes . . ., the finding of an actual controversy should be determined with some liberality." *Starter Corp.*, 84 F.3d at 596.  However, even "the most liberal interpretation of justiciability will not admit to an active controversy in the absence of either some imminent infringing conduct *or some assertion of the same*." *Id.* (emphasis in original) (quoting *Polaroid Corp. v. Berkey Photo*, *Inc.*, 425 F.Supp. 605, 609 (D. Del. 1976)).

For many years, the two-part approach set forth above governed the case or controversy determination in declaratory judgment actions involving intellectual property rights.  In 2007, however, the Supreme Court rejected the "reasonable apprehension of suit" test, lowering the threshold for showing an actual controversy in such cases.  *MedImmune*, *Inc. v. Genentech*, *Inc.*, 549 U.S. 118, 127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007).  In *MedImmune*, the plaintiff believed that its own product, which accounted for 80 percent of its sales, was not covered by a patent newly obtained by the licensor and that the licensor's patent was invalid.  The Court found an actual controversy, even though the plaintiff had complied with the defendants' demand by paying patent royalties (under protest); had not

infringed the defendants' patent; and had no reasonable fear of imminent suit.  *Id.* at 128,

137.  The Court concluded that the "reasonable apprehension" test conflicted with the

Declaratory Judgment Act, Article III, and prior Court decisions on case or controversy.  *Id.*

The Court observed that showing a controversy for the purpose of a declaratory judgment

action requires no greater showing than is required under Article III.  *Id.* at 126–27.

Examining prior cases, the Court stated that a plaintiff who is effectively coerced by another

party into eliminating a threat of suit may nonetheless bring a declaratory judgment action.

*Id.*  "The dilemma posed by that coercion – putting the challenger to the choice between

abandoning his rights or risking prosecution – is 'a dilemma that it was the very purpose of

the Declaratory Judgment Act to ameliorate.'"  *Id.* (citation and quotation omitted).  The

Court held that neither the Declaratory Judgment Act nor Article III requires a plaintiff to

expose himself to liability before bringing a declaratory judgment action.  *Id.* at 137 ("The

rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble

damages and the loss of 80 percent of its business, before seeking a declaration of its actively

contested legal rights finds no support in Article III.").

The Court noted in *MedImmune* that there is no bright-line rule for distinguishing

cases that satisfy the actual controversy requirement from those that do not.  At a minimum,

a dispute must be "'definite and concrete, touching the legal relations of parties having

adverse legal interests'; and [must] be 'real and substantial' and 'admi[t] of specific relief

through a decree of a conclusive character, as distinguished from an opinion advising what

the law would be upon a hypothetical state of facts.'"  *Id.* at 127 (quoting *Aetna Life Ins. Co.*

14

*of Hartford Conn. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461 (1937)).  The Court adopted a totality-of-the-circumstances test, stating that the "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*

The Federal Circuit's "post-*MedImmune* decisions, while not attempting to define the outer boundaries of declaratory judgment jurisdiction, have made clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *Sony Electronics*, 497 F.3d at 1284.  "While the Supreme Court rejected the reasonable apprehension of suit test as the sole test for jurisdiction, it did not completely do away with the relevance of a reasonable apprehension of suit." *Prasco*, *LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008).  "Rather, following *MedImmune*, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy." *Id.*  In the trademark context, in determining "if the threat perceived by the plaintiff is real and reasonable," the court focuses "upon the position and perceptions of the plaintiff" and "[t]he acts of the defendant [are] . . . examined in view of their likely impact on competition and the risks imposed upon the plaintiff." *Chesebrough-Pond's v. Faberge*, 666 F.2d 393, 396 (9th Cir. 1982).

In the present case, the defendants' threats of infringement litigation, express and implied, may have created a reasonable apprehension of suit in the plaintiffs.  The plaintiffs filed a notice of opposition in the TTAB in April 2007.  In February 2008, Vannerson stated that he believed he would have a cause of action if someone were selling products using the VY and INVINCEABLE marks.  At that time, the plaintiffs had "newly developed product lines and endorsement programs released on the market in 2008 and products under development for release sometime in 2009."  (Docket Entry No. 16, at ¶ 54).  After settlement negotiations, the defendants' lawyer informed the plaintiffs on December 10, 2008 that if the settlement offer was not accepted, he would "exercise every means available to protect" his clients' interests.  (Docket Entry No. 14, Ex. 12).  The plaintiffs filed this lawsuit two days later, on December 12, 2008.  (Docket Entry No. 1).

The defendants argue that because their intent-to-use trademark applications are still pending, the plaintiffs could not have had a reasonable apprehension of imminent suit. Although the defendants are correct that "no rights are conferred by the mere filing of a federal trademark application," *see S Indus.*, *Inc. v. Diamond Multimedia Sys.*, *Inc.*, 991 F.Supp. 1012, 1019 (N.D. Ill. 1998), they do not cite authority for the proposition that their present inability to assert enforceable trademark rights in a suit against the plaintiffs is enough to preclude the plaintiffs from invoking declaratory judgment jurisdiction in this suit. The court in *Benitec Australia v. Nucleonics*, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007), did identify a defendant's ability to maintain a cause of action against a declaratory judgment plaintiff as a "useful question to ask in determining whether an actual controversy exists[,]"

16

but that factor was not part of the court's analysis.  In *MedImmune*, the Supreme Court noted that it had previously exercised jurisdiction "even though the declaratory-judgment defendant could not have sued the declaratory-judgment plaintiff [ ] . . . ."  549 U.S. at 132 n. 11 (citing *Md Cas*, 312 U.S. at 273).

However, it is unnecessary to determine that the plaintiffs had a reasonable apprehension of suit.  Even when a plaintiff cannot establish a reasonable apprehension of suit, the case or controversy requirement is "met where the [defendant] takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do."  *SanDisk Corp. v. STMicroelectronics NV*, 480 F.3d 1372, 1381 (Fed. Cir. 2007).  When a trademark applicant asserts rights based on certain identified ongoing or planned activity of another party, and that party contends that it has the rights to those marks, an Article III case or controversy may arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.  *See id.*  The unsuccessful settlement negotiations and the defendants' statements about litigation and protecting their interests put the plaintiffs in the "position of either pursuing arguably illegal behavior or abandoning that which [they] claim[] a right to do."  The plaintiffs were not required to wait for the defendants to sue first before engaging in activity using the VY and INVINCEABLE marks.  *See MedImmune*, 549 U.S. at 127; *see also Minn. Mining & Mfg. Co. v. Norton Co.,* 929 F.2d 670, 673 (Fed. Cir. 1991) ("In promulgating the Declaratory Judgment Act, Congress intended to prevent avoidable damages from being incurred by a person uncertain of his

rights and threatened with damage by delayed adjudication."); *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 956 (Fed. Cir. 1987) ( "[T]he purpose of the Declaratory Judgment Act . . . in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights.").

After *MedImmune*, whether there has been potentially infringing activity or meaningful preparation to conduct potentially infringing activity is also "an important element in the totality of circumstances which must be considered in determining whether a declaratory judgment is appropriate." *Prasco*, 537 F.3d at 1336 n.4 (internal citation and quotation omitted); *see also Cat Tech LLC v. TubeMaster*, *Inc.*, 528 F.3d 871, 880 (Fed. Cir. 2008) ("We conclude that although *MedImmune* articulated a 'more lenient legal standard' for the availability of declaratory judgment relief in patent cases . . . the issue of whether there has been meaningful preparation to conduct potentially infringing activity remains an important element in the totality of circumstances . . . . If a declaratory judgment plaintiff has not taken significant, concrete steps to conduct infringing activity, the dispute is neither 'immediate' nor 'real' and the requirements for justiciability have not been met." (internal citations omitted)).  The cases have held that the nature and extent of the declaratory-judgment defendant's preparation to use the marks is important.

In *Geisha*, *LLC v. Tuccillo*, 525 F.Supp.2d 1002 (N.D. Ill. 2007), for example, the court considered whether the controversy requirement was met when a trademark owner sought a declaration of infringement based on the defendant's planned opening of a restaurant using the mark at issue.  *Id.* at 1003, 1007-08.  The plaintiff had opened a

18

restaurant called "Japonais" in Chicago, Illinois.  After the restaurant received favorable reviews, the defendant, a New York resident, filed an intent-to-use trademark registration application for a stylized version of the word "Japonais" for a restaurant.  When the defendant refused the plaintiff's request to abandon the application, the plaintiff filed suit. The defendant moved to dismiss, arguing that the court lacked jurisdiction because there was no "real or immediate controversy."  *Id.* at 1009.  The defendant had not threatened infringement litigation, expressly or implicitly.  It was undisputed that the defendant had "never used the name 'Japonais' or the Japonais design in connection with the provision of restaurant and lounge services," but he did have a "firm intent" to do so.  *Id.* at 1007.  The defendant had  "played around with the menu," decided on the type of food he would serve, and searched for a suitable location for the restaurant.  *Id.*  The defendant argued that because he had not yet used the "Japonais" name or design in connection with a restaurant or lounge, there was no actual controversy and the court would be rendering an advisory opinion on the parties' trademark rights.  *Id.* at 1009.  The plaintiff argued that exercising jurisdiction was appropriate because the defendant had made "substantial and meaningful" preparation to use the "Japonais" name and design in connection with a restaurant or lounge in New York City. Applying the totality-of-the-circumstances test from *MedImmune*, the court in *Geisha* held that the plaintiff had failed to establish that  there was an actual controversy of sufficient "immediacy and reality."  *Id.* at 1015.  The court concluded that the defendant's "actual preparations for opening a restaurant [did] not appear to have advanced significantly beyond [his] statement of intent."  *Id.*  The court held that "playing around with the menu" was "of

19

little consequence." *Id.*  Searching for a suitable restaurant location would ordinarily carry more weight "but for the fact that . . . [the defendant's search did not] appear either serious or advanced."  *Id.*  The defendant had not hired a real estate agent and his search had consisted of driving around and looking for properties by himself.  *Id.*  The defendant had never opened a restaurant before and had limited experience in the food-service business. *Id.*  The court held that the defendant's stated intent to open a restaurant, combined with the preliminary steps he had taken, showed "a mere and distant possibility of potentially infringing activity, rather than a real, immediate, or imminent threat."  *Id.* at 1016.

By contrast, in *AARP v. 200 Kelsey Associates*, *LLC*, No. 06, Civ. 81(SCR), 2009 WL 47499, at *7 (S.D.N.Y. Jan. 8, 2009), the court found enough preparation for infringing use to establish an actual controversy satisfying the *MedImmune* test.  In that case, the plaintiff, AARP, launched its "flagship publication," *Modern Maturity* magazine, in 1958.  The magazine was intended for readers aged fifty and above.  AARP obtained a federal trademark registration for the *Modern Maturity* mark in 1962.  In 2003, AARP changed the name of its publication to "*AARP, The Magazine*" but continued to use the *Modern Maturity* mark in connection with other products and services.  The defendants filed an intent-to-use trademark application for "*Modern Maturity*," a magazine also intended for senior citizens.  The defendants "contacted potential publishers, generated written business plans concerning the design and sale of the magazine, and engaged in extensive market analysis." *Id.*, at *1.  After the plaintiff sued for trademark infringement and declaratory relief, the defendants moved to dismiss, arguing that there was no actual case or controversy because they had not yet

published or sold their magazine.  The plaintiffs argued that the defendants' preparations to launch the magazine were sufficient to satisfy the actual controversy requirement.  The court found that AARP's allegations of the defendants' preparation met the case or controversy requirement.  *Id.*, at *9.  Examining both pre- and post-*MedImmune* case law, the court concluded that AARP's allegations that the defendants had "taken significant steps" toward infringement, including "actively seeking licensees to publish a magazine called 'Modern Maturity,' and 'conduct[ing an] extensive analysis of the publishing industry," were sufficient to create an actual controversy of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Id.*, at *10.  The court also accepted as true AARP's allegation that the defendants were actively searching for a licensing partner and held that the AARP did not have to "wait for defendants to actually secure that partner before filing suit."  *Id.*  The court observed that securing a licensing partner for actual publication occurs "only after one has made a number of concrete decisions concerning the proposed content, design, and layout of the magazine" and that once a partner is identified, little will remain for the defendants to do other than begin producing and selling the magazine.  *Id.*  The court held that there was "no doubt that the circumstances of this case present a 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Id.*

Cases decided before *MedImmune* examining whether there has been meaningful preparation to conduct potentially infringing activity are consistent with the results in *Geisha* and *AARP*.  The cases show that if a party has not yet identified a name or location of a

business, has not conducted any sales activity, or has not secured the necessary components for production, the case or controversy standard is not satisfied.  *See*, *e.g.*, *United American Industries*, *Inc. v. Cumberland*, No. CV-06-1833-PHX-FJM, 2007 WL 38279, at *2 (D. Ariz. Jan. 5, 2007) (finding no controversy when the defendant had not begun to use the mark in connection with any product  nor "taken any steps to sell, transport, distribute, market or advertise . . . any products or samples of products using" the mark); *Sobini Films v. Tri-Star Pictures*, *Inc.*, No. 01 Civ. 6615, 2001 WL 1824039, at *5 (C.D. Cal. Nov. 21, 2001) (finding no justiciable case or controversy when the plaintiff had not reached even preliminary agreements regarding the proposed film, had not "obtained commitments from 'key talent' such as a director and lead actors," had not contracted with any writers to create the screenplay, and was therefore not "immediately prepared" to produce the film); *Planet Hollywood (Region IV)*, *Inc. v. Hollywood Casino Corp.*, 80 F.Supp.2d 815, 874–76 (N.D. Ill. 1999) (finding no controversy when the plaintiff had not obtained regulatory approval for the casino it was asking the court to find noninfringing, had no plans to open a casino "on the drawing board," had not entered into licensing agreements with any entity with the capacity to use the trademark in connection with a casino – or even identified such an entity – and could not tell the court how it intended to use its mark in the casino business, much less the name or location of such a casino); *Lang*, 895 F.2d at 764-65 (finding no controversy when the allegedly infringing ship's hull would not be completed until at least nine months after the complaint was filed and "the accused infringers had not distributed sales literature,

prepared to solicit orders, or engaged in any activity indicating that the ship would soon be ready for sea").

If, by contrast, a party has taken steps such as producing prototypes or samples of the allegedly infringing products, soliciting business from and sending advertising to potential customers, or otherwise investing significant funds in preparation to produce the products, the case or controversy requirement is satisfied. *See*, *e.g.*, *Starter Corp.*, 84 F.3d at 596 (finding a case or controversy when the plaintiff had "designed styles and prepared prototype shoes; conducted a consumer survey; made strategic decisions regarding who should manufacture the shoes; hired an external licensing agent; and attempted to find a manufacturing partner"; and was therefore "prepared, at the time the complaint was filed, to begin manufacture and sale of shoes bearing the [marks at issue]"); *G. Heileman*, 873 F.2d at 991 (finding a controversy when the claimant alleged that it would introduce product "in the immediate future," that it had already incurred costs of product development, design, advertising, and market study, and that it was "committed to making rapidly increasing expenditures totaling millions of dollars"); *Menashe v. v. Secret Catalogue*, *Inc.*, No. 05 Civ. 239, 2005 WL 1580799, at * 6 (S.D.N.Y. July 7, 2005) (finding a controversy when the plaintiffs had registered a domain name for the mark, retained a web designer, filed an intent-to-use application with the PTO, "paid for . . . and received four hundred samples of their product, as well as eight final articles that would serve as prototypes[,] and . . . engaged in activities including interviews and photo shoots to promote their lingerie line"); *Dr. Reddy's Labs.*, *Ltd. v. aaiPharma Inc.*, No. 01 Civ. 10102, 2002 WL 31059289, at *9

(S.D.N.Y. Sept. 13, 2002) (finding an actual controversy when the plaintiff had obtained tentative FDA approval of a generic version of a drug and spent millions on developing the product, including on constructing a plant to manufacture it).

Courts in this district have reached similar conclusions about the extent of preparations required to create an actual controversy in trademark-infringement cases.  *See, e.g., Vantage Trailers v. Beall Corporation*, Civ. A. No. H-06-3008, 2008 WL 304747, at *5 (S.D. Tex. Jan. 31, 2008) ("*Vantage I*"); *Vantage Trailers v. Beall Corporation*, Civ. A. No. H-08-0361, 2008 WL 4746288, at *4 (S.D. Tex. Oct. 27, 2008) ("*Vantage II*").  In *Vantage I*, the plaintiff sought a declaratory judgment that a trailer it was designing did not infringe the defendant's trademark for the "Beall Bullet," a bottom-dumping truck trailer with conical, tapered front and back ends.  2008 WL 304747, at *1.  On the date suit was filed, the plaintiff was "*planning* to manufacture and sell an aluminum bottom dump trailer" and was "*in the process of designing* and manufacturing products Defendant has claimed will infringe the Mark."  *Id.*, at *4 (emphasis in original).  The trailer design was reflected in a "skeletal, undated drawing."  *Id.*  The plaintiff alleged that it was "working with an outside engineer for the development, testing, and completion of design work for the *initial* design." *Id.* (emphasis in original).  The court held that there was no actual case or controversy.  *Id.*, at *5–6.  The court observed that on the date suit was filed, the plaintiff was "in the early stages of developing a design for a trailer and had no facilities in which to manufacture it." *Id.*, at *6.  The plaintiff's design for the trailer was not fixed at the time of filing suit, but was "fluid and indeterminate."  *Id.*, at *5.  The plaintiff's marketing and sales activities were

24

merely preliminary negotiations contingent on finalizing the design.  *Id.*  The court held that because nothing was "fixed and certain" about the plaintiff's trailer, resolving whether it infringed on defendant's mark would be nothing more than an advisory opinion on a hypothetical state of facts.  *Id.*

The *Vantage I* plaintiff finalized the design, manufactured an actual trailer for sale, and delivered it to a customer, then again filed suit seeking a declaratory judgment of noninfringement.  *See Vantage II*, 2008 WL 4746288, at *4.  At that time, the plaintiff was also in the process of manufacturing five additional trailers for that customer.  *Id.*  The plaintiff alleged that the design for its trailer facially resembled the design in the defendant's trademark registration and that the defendant was its direct competitor.  *Id.*  The court held that the facts and allegations presented a dispute that was sufficiently "definite and concrete" to support jurisdiction.  *Id.*

Applying the criteria identified in the case law, and considering the totality of the circumstances, the dispute in the present case satisfies the case or controversy requirement. Contrary to the defendants' arguments, a trademark application need not have matured into a registration before an actual controversy of sufficient "immediacy and reality" exists between the parties.  *See AARP*, 2009 WL 47499, at *7 (finding a controversy when the defendants' intent-to-use trademark application was still pending and the defendant had not yet sold allegedly infringing product).  The defendants' alleged statements about infringement litigation and alleged preparations for conducting infringing activity are sufficient to establish the requisite case or controversy under pre- and post-*MedImmune* case

law.  Unlike *Geisha* and *Vantage I*, this case involves more than mere intent and preliminary preparations.  The plaintiffs alleged that the defendants have expended considerable sums to develop and to market the VY and INVINCEABLE marks.  The defendants have allegedly designed and produced decals and T-shirts using a VY logo that is allegedly substantially similar to Vincent Young, Inc.'s VY shield.  The defendants have allegedly "contracted with a manufacturing company to produce VY decals and T-Shirts bearing their VY logo." (Docket Entry No. 16, at ¶ 65).  They have produced samples of various other products incorporating the VY logo and the INVINCEABLE mark.  The defendants have allegedly contacted manufacturers and tested the market with these samples.  As in *AARP*, *Starter Corp.*, and *G. Heileman*, once the defendants secure a manufacturing company for these other products, "little will remain for defendants to do other than commence production, distribution, and sale" of products incorporating the VY logo and INVINCEABLE mark. *See AARP*, 2009 WL 47499, at *9.  Under the facts alleged, the defendants have taken significant, concrete steps to conduct infringing activity.  The circumstances of this case do not require this court to determine "what the law would be upon a hypothetical state of facts." *See MedImmune*, 549 U.S. at 127.[3]  And the defendants' position with respect to their rights in the marks and implicit threats of litigation put the plaintiffs in the position of either pursuing arguably illegal behavior or refraining from doing that which they assert a right to

---

[3]  Because the defendants' threats of litigation and preparations to use the marks in commerce present a controversy of sufficient immediacy and reality to establish jurisdiction, it is unnecessary to consider the plaintiffs' alternative argument that an actual controversy is present due to the defendants' bad faith in filing the trademark applications without a *bona fide* intent to use them in commerce.

26

do.  The dispute in this case presents a case or controversy that satisfies the requirements of Article III and the Declaratory Judgment Act.  The defendants' motion to dismiss for lack of subject-matter jurisdiction is denied.

### III.    The Motion to Dismiss for Failure to State a Claim

#### A.    The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."  FED. R. CIV. P. 12(b)(6).  The Supreme Court recently overruled the longstanding rule announced in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1968–69 (2007).  Under *Twombly*, a court must not dismiss a complaint for failure to state a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974; *Sonnier v. State Farm Mut. Auto. Ins. Co.*, No. 07-30098, 2007 WL 4260892, at *1 (5th Cir. Dec. 6, 2007) (quoting *Twombly*, 127 S. Ct. at 1974); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  "[A] plaintiff is obligated to provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Bradley v. Phillips Petroleum Co.*, No. H-05-3912, 2007 WL 4443876, at *2 (S.D. Tex. Dec. 18, 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief – including factual allegations that when assumed

27

to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1964–65); *Sonnier*, 2007 WL 4260892, at *1 (quoting *Twombly*, 127 S.Ct. at 1965). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Cuvillier*, 503 F.3d at 401 (quoting *Twombly*, 127 S. Ct. at 1966) (quotations omitted). Although material allegations in the complaint must be accepted as true and construed in the light most favorable to the nonmoving party, a court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. *See Twombly*, 127 S. Ct. at 1967–70.

### B.   Analysis

The defendants argue that the plaintiffs' trademark infringement claim should be dismissed because the allegations are conclusory and are "not supported by specific allegations of fact." (Docket Entry No. 12, at 5). They contend that the plaintiffs "have failed to establish or assert that Defendants have performed any act which might give right to any liability on Defendants' part." (*Id.*, at 9).

The elements of a trademark infringement claim under the Lanham Act are that the plaintiff is the owner of a valid and protectable or registerable mark and the defendant's use of the mark creates a likelihood of confusion. *Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 310 (5th Cir. 2008). Additionally, the plaintiff must prove that the defendant

28

used the plaintiff's mark "in commerce."  *See* 15 U.S.C. § 1114(1); *Software Publishers Association v. Scott & Scott*, *LLP*, 2007 WL 92391, at *7 (N.D.Tex. Jan. 11, 2007).  Courts have found that a trademark infringement claim satisfies this element and may proceed even if a product has not actually been sold.  *See*, *e.g.*, *AARP v. 200 Kelsey Associates*, *LLC*, No. 06 Civ. 81(SCR), 2009 WL 47499, at *7 (S.D.N.Y. Jan. 8, 2009) (finding the "use in commerce" element satisfied where defendants were "actively seeking licenses to publish" an allegedly infringing magazine and had "conducted an extensive analysis of the publishing industry"); *Bertolli USA*, *Inc. v. Filippo Bertolli Fine Foods*, *Ltd.*, 662 F.Supp. 203, 205 (S.D.N.Y. 1987) (finding the "use in commerce" element satisfied where defendants sent one bottle of olive oil to a distributor, offered the product to another, and printed labels and cartons for the allegedly infringing oil).  In considering whether a plaintiff has established a likelihood of confusion, courts consider: (1) the similarity between the parties' products or services; (2) the strength of the plaintiff's mark; (3) the similarity between the parties' marks; (4) the identity of the advertising media used; (5) the defendant's intent; (6) the identity of customers and retail outlets; and (7) evidence of actual confusion.  *Board of Supervisors for Louisiana State University v. Smack Apparel Company*, 550 F.3d 465, 478 (5th Cir. 2008); *see also Elvis Presley Enters.*, *Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998).  "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors."  *Smack Apparel*, 550 F.3d at 478.

The plaintiffs have adequately alleged a cause of action for trademark infringement. In the amended complaint, the plaintiffs alleged that they are the common-law owner of these

marks; that they used the marks in commerce; and that they are the senior users. They alleged that the defendants have undertaken extensive preparations to use the marks in commerce, including producing samples of various products incorporating the marks, testing the market, and contracting with a manufacturer. The plaintiffs alleged that the products they have marketed or plan to market using VY and INVINCEABLE are similar to the products the defendants intend to sell using these marks. These products include clothing, video games, and photographs. According to the plaintiffs, Young is widely known and recognized by the abbreviated name "VY" and the nickname "Invinceable." The plaintiffs alleged that Young is of "sufficient fame and reputation in the United States" that consumers would presume a connection with him if the defendants sold products using the VY and INVINCEABLE marks. These allegations are sufficient to state a claim for trademark infringement. The defendants' motion to dismiss is denied.


## IV.    Conclusion

The defendants' motions to dismiss for lack of subject-matter jurisdiction and for failure to state a claim are denied.

SIGNED on April 27, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

30